UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GEL DIRECT TRUST,<br>GEL DIRECT, LLC,<br>JEFFREY K. GALVANI,<br>STUART A. JEFFERY,<br><br>Defendants. | Civ. Action No. 1:22-cv-09803<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against GEL Direct Trust ("GEL"), GEL Direct, LLC ("GEL Trustee"), Jeffrey K. Galvani ("Galvani"), and Stuart A. Jeffery ("Jeffery") (collectively, "Defendants"), and alleges as follows:

## SUMMARY

1. GEL, its managing trustee (GEL Trustee), and its co-owners and control persons (Galvani and Jeffery), have engaged in the business of selling penny stocks and other securities for the accounts of GEL's customers without being registered as brokers or being associated with a registered broker.

2. Galvani and Jeffery created GEL, which they manage through its trustee, GEL Trustee. Neither GEL nor GEL Trustee are registered with the SEC as a broker-dealer.

3. Nonetheless, GEL's business model is to act as an introducing broker. Among other actions, GEL: (a) takes possession of its customers' penny stocks; (b) finds executing brokers willing to sell the stocks in the market; (c) directs the executing brokers on completing

the sales; and (d) facilitates the settlement of the trades and disbursement of proceeds to its customers.

4. From approximately June 2019 to at least May 2022, Galvani and Jeffery, acting through the unregistered GEL entities, used this business model to execute more than 19,000 trades of more than 300 billion shares of stock of more than 400 issuers on behalf of approximately 60 customers. These trades generated more than $1.2 billion of trading proceeds for GEL's customers. In turn, GEL received more than $12.4 million in compensation, including transaction-based compensation, from its customers.

5. By engaging in the conduct alleged herein, Defendants violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)]. Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Galvani and Jeffery -- as control persons of GEL and GEL Trustee -- are also liable for GEL's and GEL Trustee's Section 15(a) violations.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The SEC brings this action pursuant to the authority conferred upon it by Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. § 78u(d) and 78u(e)].

7. The SEC seeks a final judgment permanently enjoining Defendants from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], ordering Defendants to disgorge all ill-gotten gains obtained as a result of the violations alleged herein (together with prejudgment interest), ordering Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], barring Defendants from participating in any offering of any penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], and ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. Defendants made use of the mails or means or instrumentalities of interstate commerce in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

10. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within this District. Defendants also transact business within this district.

## DEFENDANTS

11. GEL is a Delaware statutory trust that maintains its principal office in New York, New York.

12. GEL Trustee is a Delaware limited liability company that maintains its principal office in New York, New York. GEL Trustee is the managing trustee of GEL. Galvani and Jeffery co-own and co-manage GEL Trustee.

13. Galvani is a resident of Hudson County, New Jersey.

14. Jeffery is a resident of Nassau County, New York.

## FACTS

A. Background

15. Galvani and Jeffery have worked in the securities industry since approximately 1997 and 2006, respectively, and they are currently affiliated as registered representatives at the same registered broker-dealer. They have known each other for many years.

3

16.     In approximately early 2019, Galvani and Jeffery decided to start a new financial firm outside of their affiliation with the registered broker-dealer.

17.     To that end, Galvani and Jeffery formed GEL, and at all times have jointly controlled GEL.

18.     Galvani and Jeffery exercise control over GEL through its managing trustee, GEL Trustee.  Galvani and Jeffery each own 50% of GEL Trustee.

19.     Galvani and Jeffery established GEL as a firm that could facilitate securities transactions for its customers by, among other things: (i) assisting in executing, clearing, and settling securities transaction; (ii) accepting, routing, matching, or otherwise handling customer orders; and (iii) handling customer funds and securities.

20.     Using their experience and connections in the industry, Galvani and Jeffery had no trouble finding customers for their new firm.  GEL obtained many of its customers through customer referrals and referrals from other brokerage firms.  As of May 2022, GEL had opened accounts for approximately 60 customers, including customers in multiple U.S. states.

21.     The vast majority of GEL's trading activity related to the sale of penny stocks that its customers obtained through various sources, including the acquisition of convertible promissory notes or other forms of microcap financing.

22.     Neither GEL nor GEL Trustee has ever been registered as a broker-dealer.

23.     From at least June 2019 to May 2022, Galvani and Jeffery conducted GEL's and GEL Trustee's business without any affiliation with a registered broker-dealer.

24.     Although Galvani and Jeffery were affiliated brokers of a registered broker-dealer during that period, their GEL-related activities were conducted separate and apart from their affiliation with that broker-dealer, and Galvani and Jeffery listed their GEL-related activities as

"Other Business Activities" that were separate and apart from their affiliation with that broker-dealer.

25. In February 2022, Galvani and Jeffery attempted for the first time to include their GEL-related activities with their affiliated broker-dealer. However, the broker-dealer did not supervise any of GEL's trading activity before May 2022, at the earliest.

**B. GEL's Business Model**

26. Every new GEL customer was required to fill out an "Account Application" that, among other things, confirmed that GEL would have trading authorization over the customer's securities. The Account Application stated explicitly that: "you grant trading authorization [to GEL] when you sign your application."

27. Several GEL customers also provided their own documents to GEL confirming their understanding that they were opening a "brokerage account" with GEL and that GEL would provide broker-dealer services.

28. After enrolling a new customer, GEL sent a "Welcome Packet" that:

- Listed Galvani and Jeffery as GEL's Managing Partners;
- Stated that customers would use "the following form to authorize the transfer of assets, currently at another firm, to your brokerage account held at GEL";
- Provided a "Deposit Checklist" that included general requirements to ensure that customers could transfer their securities to GEL; and
- Required customers to set up an account for GEL to wire their trading proceeds.

29. GEL established omnibus accounts in its name to hold its customer's trading proceeds and GEL's fees. The omnibus accounts had sub-accounts associated with each

customer. GEL controlled the omnibus accounts and their subaccounts. Initially, the GEL omnibus accounts were maintained at a trust company, and later at the financial institutions maintaining the custodian accounts described in the following paragraph.

30. GEL established custodian accounts in its name at several financial institutions. GEL's customers, following GEL's instructions, used electronic transfers to deposit their penny stocks and other securities into the custodian accounts, thereby giving GEL control over the handling and disposition of its customers' securities.

31. GEL further established approximately 20 delivery-versus-payment ("DVP') brokerage accounts at domestic and offshore brokerage firms. GEL used these DVP brokerage accounts to place trades to sell its customers' securities.

32. After a customer deposited their penny stocks or other securities into one of GEL's custodian accounts and they were under GEL's control, GEL found executing brokers who were willing to sell the securities in the market through one of GEL's DVP brokerage accounts.

33. GEL provided trading instructions on behalf of its customers to the executing brokers and directed the executing brokers to sell the securities. As alleged in more detail below, these instructions often included directives on price and volume.

34. The executing broker then sold the securities based on GEL instructions, typically by placing trades in the U.S. over-the-counter market. After an executing broker sold the securities through one of GEL's DVP brokerage accounts, the funds settled at one of GEL's custodian accounts.

35. Thereafter, GEL would continue to facilitate the settlement process. Typically, GEL would transfer the settled funds from the custodian account to a GEL omnibus account.

36. GEL then allocated trading proceeds to the omnibus subaccount associated with the customer. GEL kept internal records to track securities from the settled trades to its customers' accounts, which corresponded to the GEL-controlled subaccounts.

37. After GEL directed the funds to the subaccount, GEL followed instructions from its customers for wiring the trading proceeds to the customers' bank accounts. GEL wired hundreds of millions of dollars in customer trading proceeds to customer bank accounts or to third-party bank accounts on behalf of its customers.

38. The following illustrates a typical GEL transaction:



39. GEL's customers -- and not GEL -- owned virtually all of the penny stocks and other securities that GEL traded through its custodian and DVP brokerage accounts.

40. Between approximately June 2019 and May 2022, GEL executed more than 19,000 trades of more than 300 billion shares of stock of more than 400 issuers on behalf of approximately 60 customers. These trades generated more than $1.2 billion of trading proceeds

for GEL's customers.

### C. Defendants Directed Trading in Securities.

41.     GEL often used Bloomberg messaging to communicate trade requests to the executing brokers.  In many instances, GEL provided specific price and volume directives to the executing brokers on behalf of GEL's customers.  GEL also exercised discretion over many of the trades it was directing on its customers behalf.

42.     For example, on July 2, 2019, the Bloomberg handle "GELDIRECT" instructed an executing broker to sell shares at "15% of volume please."

43.     As another example, on July 11, 2019, the GEL Bloomberg account registered to Galvani told an executing broker on penny stock identified by name and ticker "…if there is anything else we can trade today, please let me know…please reoffer…at .80."

44.     As another example, when an executing broker asked GEL if it wanted to sell additional shares of a penny stock identified by name and ticker, the GEL Bloomberg account registered to Galvani responded "yes" six seconds later.

45.     When GEL communicated with executing brokers, it made clear that GEL was entering trades.  For example, on September 3, 2020, a GEL Trustee employee sent an email to an executing broker stating:  "I'm working through the trades for today and yesterday that we [GEL] placed with you fine folks…."

### D. Galvani and Jeffery Directly Participated in and Controlled the Enterprise.

46.     At all times, Galvani and Jeffery shared ultimate decision-making authority over all of GEL's and GEL Trustee's activities and policies, and they co-managed the business of GEL and GEL Trustee.

47. No other individuals exercised managerial discretion or control over GEL or GEL Trustee. GEL Trustee had approximately two employees during the relevant period. Galvani and Jeffery were responsible for supervising those employees.

48. Galvani and Jeffery both executed documents to open custodian accounts to accept customer securities and to open the DVP brokerage accounts necessary to execute trades on behalf of GEL customers. Galvani and Jeffery both controlled and were authorized signatories for the custodian accounts and DVP brokerage accounts. Galvani and Jeffery were both listed as authorized traders for GEL.

49. Galvani and Jeffery both provided a range of brokerage services to GEL's customers, including, but not limited to, providing trading directions to executing brokers on behalf of customers, providing instructions to facilitate the settlement of trades and wiring of trading proceeds, and communicating with customers about their securities and trading activity.

### E. Defendants Received Transaction-Based Compensation

50. GEL received multiple types of compensation from its customers, including transaction-based compensation. The compensation structure was set forth in a fee schedule.

51. GEL charged each customer a $2,500 monthly account maintenance fee.

52. GEL charged its customers a transaction-based fee for each deposit of securities the customer made with GEL for GEL to sell through the executing brokers. The fee was $1,100 per deposit in most instances, but varied depending on the type of securities deposited.

53. GEL charged a $30 trade-settlement fee each time it completed a trade on behalf of a customer.

54. GEL charged rush fees to expedite the review and trading process, and other fees related to brokerage-type services such as a: (i) $150 termination fee, (ii) $35 wire transfer fee, (iii) $250 alternative asset fee, and (iv) $75 Roth conversion fee.

55. Each month, GEL collected these fees from its customers, which account documents referred to as "commissions." Between June 2019 and May 2022, GEL received more than $12.4 million dollars in fees from its customers.

56. The fees that GEL collected from its customers were transferred from GEL's bank accounts to GEL Trustee's bank accounts and other bank accounts that Galvani and Jeffery controlled.

57. Galvani and Jeffery split profits in accordance with their 50-50 ownership interest. Customer fees were paid out to Galvani's and Jeffery's personal accounts from fees deposited in the GEL, GEL Trustee, and other controlled accounts.

## FIRST CLAIM FOR RELIEF

**Violations of Section 15(a) of the Exchange Act**
**(against all Defendants)**

58. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

59. By engaging in the conduct alleged above, Defendants acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)], and made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities.

60. With respect to the securities transactions at issue, Defendants were not registered with, or an associated person of a firm registered with, the SEC.

61. Defendants did not qualify for an exemption from the registration requirements.

62. By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## SECOND CLAIM FOR RELIEF

**Control Person Liability for Violations of Section 15(a) of the Exchange Act
(against Galvani and Jeffery)**

63.     The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above

64.     At all times, Galvani and Jeffery controlled GEL and GEL Trustee within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

65.     Galvani and Jeffery, directly or indirectly, induced the act or acts constituting GEL's and GEL Trustee's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

66.     By engaging in the conduct alleged above, Galvani and Jeffery are liable as control persons for GEL's and GEL Trustee's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

67.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Galvani and Jeffery are liable for GEL's and GEL Trustee's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] to the same extent as GEL and GEL Trustee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants from violating, directly or indirectly, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### II.

Permanently restraining and enjoining Defendants Galvani and Jeffery from, directly or indirectly, controlling any person who violates Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### III.

Ordering Defendants to disgorge all ill-gotten gains derived from the conduct alleged in this Complaint, together with prejudgment interest thereon;

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### V.

Prohibiting each Defendant from participating in any offering of any penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

### VI.

Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands trial by jury in this action on all issues so triable.

Dated: November 17, 2022         Respectfully submitted,

/s/ Keefe M. Bernstein
Keefe M. Bernstein*
Derek B. Kleinmann*

*Application for admission *pro hac vice* pending

Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: (817) 900-2607 (Bernstein)
bernsteink@sec.gov
Tel: (817) 900-2623 (Kleinmann)
kleinmannd@sec.gov