**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | **Hon. Jed S. Rakoff** |
| -against- | **Civ. Action No. 1:22-cv-09803** |
| **GEL DIRECT TRUST,** **GEL DIRECT, LLC,** **JEFFREY K. GALVANI,** **STUART A. JEFFERY** | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 4

FACTUAL BACKGROUND ................................................................................................. 6

LEGAL STANDARD ........................................................................................................... 13

ARGUMENT ......................................................................................................................... 14

    1.   The SEC Has Not Set Forth a Plausible Claim that Defendants Were "Brokers" Therefore There is No Viable Claim Under Section 15(a) ...........................................14

    2.   Despite No Requirement That They Do So, GEL and its Principals Were Registered During the Transactions In Question ...............................................................................19

    3.   Alternatively, The "Finders Exception" Applies to the Conduct Alleged Here ........17

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.,* 2009 WL 2777869 (N.D.Tex.2009) ................................................................................................................................. 18

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)......................... 14

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)........ 13

*Broder v. Cablevision Systems Corp.,* 418 F.53d 187 (2d Cir. 2005)......................................... 10

*Cornhusker Energy Lexington, LLC v. Prospect St. Ventures,* 2006 WL 2620985 (D.Neb.,2006); ........................................................................................................................ 18

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) ........................................................................ 13, 14

*In re Nine West LBO Securities Litigation*, 482 F.Supp.3d 187 (S.D.N.Y., 2020)..................... 10

*In re Silvercorp Metals, Inc. Securities Litigation,* 26 F.Supp.3d 266 (S.D.N.Y., 2014) .......... 19

*Northwell Health, Inc. v. Lexington Insurance Company*, 550 F.Supp.3d 108 (S.D.N.Y., 2021)

...................................................................................................................................................... 14

*Salamon v. CirTran Corp.*, 2005 WL 3132343, *2–*3 (D.Utah 2005) ...................................... 18

*Salamon v. Teleplus Enterprises, Inc.,* 2008 WL 2277094, *8 (D.N.J.2008) ............................ 18

*Schatzki v. Weiser Capital Management, LLC*, 2016 WL 6662264, at *5 (S.D.N.Y., 2016) ..... 18

*SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. 1984) .................................................... 15, 16

*SEC v. Kramer*, 778 F.Supp.2d 1320 (M.D. Fla., 2011) ............................................................ 20

*SEC* v. *M & A West, Inc.,* 2005 WL 1514101 (N.D. Cal.2005) ................................................... 17

*SEC. v. StratoComm Corp.,* 2 F.Supp.3d 240 (N.D.N.Y., 2014) ................................................ 14

*SEC v. Kern,* 425 F.3d 143 (2d Cir. 2005) ................................................................................. 18

*SEC v. Martino,* 255 F.Supp.2d 268 (S.D.N.Y.2003) ........................................................... 15, 16

## Statutes

15 U.S.C. § 78c(4). ...................................................................................................................... 16

## Other Authorities

DAVID A. LIPTON, 15 BROKER–DEALER REGULATION § 1:18 .................................... 18

## Regulations

Section 15(a) of the Exchange Act ............................................................................................... 14

Section 3(a)(4) the Exchange Act................................................................................................. 14

Defendants GEL Direct Trust, Gel Direct, LLC, Jeffrey K. Galvani, and Stuart A. Jeffery, (collectively, "Defendants" or "GEL"), by and through undersigned counsel, hereby submit this motion to dismiss the Complaint filed by the Securities and Exchange Commission ("Plaintiff" or "SEC"). For the reasons stated below, the Complaint should be dismissed for failure to state claim upon which relief may be granted and the Court should grant the Defendants such other relief as it may deem just and proper.

## INTRODUCTION

No matter how drunk someone is, you cannot arrest him for a "DUI" while he is seated on the subway heading home. The SEC has brought an action against GEL for operating as an unregistered broker. However, they have failed to plead adequate facts to show GEL was acting as a "broker" at all. The SEC points to the existence of a law and rule that is generally applicable, like the prohibition against drunk driving. Yet much as no police officer would have the facts to explain arresting a drunk driver on the 4 train, a close reading of the Complaint demonstrates that the SEC cannot explain what GEL does which requires registration.

GEL is essentially a books and recordkeeping service. Gel is an outsourced admin. An exhaustive review of relevant caselaw has found no case where a business with GEL's business model has been found to have violated the registration rules that underpin the SEC's action. GEL is a novel operation, conceived to fill a void in the industry, where companies and clients did not have a back-office solution to facilitate and keep track of their business operations and monitor their own trading activity. GEL does not buy or sell securities, and thus the broker-dealer registration requirements are no more applicable to GEL than a DUI is to a subway passenger.

The SEC's inherent problem is that the Complaint cannot point to a single share that GEL purchased or sold. All shares apparently at issue (these are not plead with specificity) were

obtained by GEL's customers on their own. In fact, the Complaint does not have any details about how the customers obtained these shares. With that said, it is sufficient that the Court understand that GEL is not alleged to have bought a single share of stock for any of its customers. Similarly, the Complaint continuously admits that the sales of these shares were performed by various "executing brokers." That is, each sale was conducted by a properly licensed broker-dealer and not by GEL. To be perfectly clear then, GEL is not alleged to have bought or sold a single security – yet somehow the SEC alleges that GEL was required to have been registered as a broker-dealer.[1]

The Complaint glosses over the myriad problems it has explaining why GEL's activity requires registration by jumping to conclusions and glossing over problems with words like "facilitated" doing an awful lot of heavy lifting. Of course, the Court's law clerks "facilitate" the work of the Court, but are not somehow required to also be appointed by the President and approved by the Senate. Many executives of many companies have administrative assistants, who facilitate the work of the licensed executive. Many physicians have physician's assistants who are not MDs. Indeed, brokerage firms often employ numerous unlicensed support staff to facilitate the operations of the brokerage firm. Countless professions exist primarily to "facilitate" the providing of professional service done by other, licensed professionals. The Complaint does not, because it cannot explain why what GEL does requires registration.

Further, even assuming *arguendo* that GEL and its principals are required to be registered with FINRA – then the Complaint must be dismissed because they actually are registered and affiliated with a licensed broker-dealer. The Complaint concedes as much, and again does not explain why two FINRA licensed brokers running an OSJ of a licensed broker-dealer are not somehow registered "enough" for the SEC's liking. Finally, even assuming *arguendo* that (1)

---

[1] Ironically, as discussed below in more detail the GEL principals were in fact affiliated with a licensed broker-dealer, forming yet another basis to dismiss the SEC's Complaint.

GEL and its principals are required to be registered with FINRA – and they are not; and (2) also assuming *arguendo* that GEL and its principals were not registered with FINRA – although they are; then (3) the Complaint nevertheless fails to sufficiently set forth a series of specific facts and circumstances upon which a claim for the relief requested may be premised.

Therefore, as more fully discussed below, the Complaint must be dismissed in its entirety pursuant to FRCP 12(b)(6).

## FACTUAL BACKGROUND

It should be noted that Defendants dispute many of the facts alleged in the Complaint, and, if the full cases is not disposed of on this Motion to Dismiss, will demonstratively dispute these facts to the Court. With that said, even assuming the veracity of the Complaint's facts, as we must on a motion to dismiss, the Complaint actually concedes the points Defendants argue herein. Indeed, a close look at the wording of the allegations is telling in formulating the actual factual background. Myriad examples abound, as detailed below:

> ¶1. GEL, its managing trustee (GEL Trustee), and its co-owners and control persons (Galvani and Jeffery), have engaged in the business of selling penny stocks and other securities for the accounts of GEL's customers without being registered as brokers or being associated with a registered broker.

This introductory sentence clearly and succinctly sets forth the SEC's cases against Defendants. It is also clearly contradicted by, for example, ¶15 and ¶24.

> ¶2. Galvani and Jeffery created GEL, which they manage through its trustee, GEL Trustee. Neither GEL nor GEL Trustee are registered with the SEC as a broker-dealer.

Similarly, this sentence is contradicted, at least in part, by ¶25.

¶4.     From approximately June 2019 to at least May 2022, Galvani and Jeffery, acting through the unregistered GEL entities, used this business model to execute more than 19,000 trades of more than 300 billion shares of stock of more than 400 issuers on behalf of approximately 60 customers. These trades generated more than $1.2 billion of trading proceeds for GEL's customers. In turn, GEL received more than $12.4 million in compensation, including transaction-based compensation, from its customers.

If nothing else, this certainly explains why GEL's customers have always been very pleased with GEL. More to the point, this is apparently not a case where disgorgement is in order (although that is one of the claims for relief).

¶15.    Galvani and Jeffery have worked in the securities industry since approximately 1997 and 2006, respectively, and they are currently affiliated as registered representatives at the same registered broker-dealer.     They    have known each other for many years.

Again, as ¶1 makes clear, the SEC's case is predicated on Galvani and Jeffery allegedly not "being registered as brokers or being associated with a registered broker," (and also the unfounded assumption that they actually need to be registered as brokers or associated with a registered broker). It is at best unclear why ¶15 in and of itself is not fatal to the SEC's case.

¶19.    Galvani and Jeffery established GEL as a firm that could **facilitate** securities transactions for its customers by, among other things: (i) **assisting** in executing, clearing, and settling securities transaction; (ii) accepting, routing, matching, or otherwise handling customer orders; and (iii) handling customer funds and securities.

The emphasis in the above paragraph was added to show just how much heavy lifting these two words are doing here. Read more honestly, ¶19 concedes that entities ***other than GEL*** actually perform the alleged activities.

¶20.    Using their experience and connections in the industry, Galvani and Jeffery had no trouble finding customers for their new firm. GEL obtained many of its customers through customer referrals and referrals from other brokerage firms. As

of May 2022, GEL had opened accounts for approximately 60 customers, including customers in multiple U.S. states.

This paragraph could otherwise be summarized as follows: GEL did not solicit customers.

¶21.    The vast majority of GEL's trading activity related to the sale of penny stocks that its customers obtained through various sources, including the acquisition of convertible promissory notes or other forms of microcap financing.

Similarly, this paragraph can be rephrased as follows: Gel had nothing to do with buying any of these shares as the customers all came to GEL unsolicited with these shares already in their possession.

¶22.    Neither GEL nor GEL Trustee has ever been registered as a broker-dealer.

Remarkably, this allegation is about to be partially contradicted in the very next sentence.

¶23.    From at least June 2019 to May 2022, Galvani and Jeffery conducted GEL's and GEL Trustee's business without any affiliation with a registered broker-dealer.

Here, the SEC begins to back off its prior allegation, conceding that while GEL and GEL Trustee were not registered as a broker-dealer, they were, at least eventually, affiliated with one.

¶24.    Although Galvani and Jeffery were affiliated brokers of a registered broker-dealer during that period, their GEL-related activities were conducted separate and apart from their affiliation with that broker-dealer, and Galvani and Jeffery listed their GEL-related activities as "Other Business Activities" that were separate and apart from their affiliation with that broker- dealer.

While ¶24 contains certain factual disputes, for now Defendants must accept it as true. Even with that limitation, ¶ can be rephrased to say: Galvani and Jeffery were properly affiliated with a registered broker-dealer during the time period in question, and that broker-dealer had some kind of notification of GEL's activity as well, as it could not have "listed" that business as anything if it was unaware.

¶25.    In February 2022, Galvani and Jeffery attempted for the first time to include their GEL-related activities with their affiliated broker-dealer. However,

the broker-dealer did not supervise any of GEL's trading activity before May 2022, at the earliest.

Here the SEC concedes that none of the relief it seeks that exists for a deterrent effect is required. GEL still maintains that there is no requirement that it be registered, and GEL had no reason to believe the SEC disagreed until (as usual, through regulation by enforcement) the SEC's interpretation was conveyed by enforcement staff. While GEL still disagrees with the SEC's interpretation, it is also willing to comply. Thus, as the SEC concedes here, upon learning that the SEC through GEL's registration was insufficient prior to February 2022, as of February 2022 Defendants attempted to have their affiliated broker-dealer do even more. As for what the broker-dealer did or did not do, Defendants cannot control the actions of the broker-dealer. All they can do is affiliate and inform the broker-dealer, which is exactly what they did.

> ¶26. Every new GEL customer was required to fill out an "Account Application" that, among other things, confirmed that GEL would have trading authorization over the customer's securities. The Account Application stated explicitly that: "you grant trading authorization [to GEL] when you sign your application."

The entirety of this section, beginning at ¶26, depends greatly on the bracketed and highly misleading [to GEL] language above, when there is no context or support for how they came to the conclusion that the client was granting authority to trade "to GEL". In fact, the customers were not granting trading authorization to GEL, but either to themselves or another authorized representative, such as their RIA. An example of one such filled out application is annexed as Exhibit A to the Galvani Declaration, notably absent from the SEC's Complaint.[2] The document provides:

---

[2] Where a plaintiff has "reli[ed] on the terms and effect of a document in drafting the complaint," and that document is thus "integral to the complaint," we may consider its contents even if it is not formally incorporated by reference." *Broder v. Cablevision Systems Corp.,* 418 F.3d 187, 196

<u>ACCOUNT CHARACTERISTICS</u>
These features can be modified or withdrawn upon written notice to GEL. For Cash Management, obtain the appropriate form(s) from your Authorized agent(s)

**Trading and Asset Movement Authorization**
**Trading Authorization**
Authorizes GEL to accept trades, servicing, account-related, or other instructions on your account from your Authorized Agent(s), without direct instructions from you. Trading authorization is a feature of all accounts opened with this application; you grant trading authorization when you sign your application. **By granting trading authorization** ***to your Authorized Agent(s),*** you understand and agree that your Authorized agent(s) will have the ability to instruct GEL to initiate transfers of cash for your bank account to your GEL account, based on standing written funds transfer instructions provided by you to GEL.

Exhibit A, page 2 (emphasis added)

This provision is not granting trading authorization "to GEL" – it is granting trading authorization to those "Authorized Individuals" listed in the application. A separate section in the application provides that each company (new client) can provide "Personal Information" for Authorized Individual/Partners" (Exhibit A, p. 2) as well as "Additional Authorized Individuals" (Id. p. 8). The Complaint is clearly attempting to re-write the provision which they clearly have seen, or otherwise could not take quotes from.

Furthermore, on page 13 of the New Customer Application, the document provides:

**By signing below you:**
**…**
- Grant your Authorized Agent(s)/Advisor(s) trading authority, as defined in the IRA Account Agreement, and agree that we may accept instructions on your account (such as orders to buy and sell securities) from your Authorized Agent(s)/Advisor(s)
  …
- Confirm that any and all Authorized Agent/Advisors you have designated and authorized is either a state or SEC registered investment advisor and has discretion over your account pursuant to a separate written advisory contract.
  …

---

(2d Cir., 2005), *and see In re Nine West LBO Securities Litigation*, 482 F.Supp.3d 187, 196 (S.D.N.Y., 2020).

- Understand that we will act only on authorized instructions, and have no responsibility to monitor or review your account, to determine the suitability of any investment, or to judge the appropriateness of any instruction placed so long as it appears to be authorized. You can revoke this authorization any time by giving us written notice.

It is clear from the above agreement that the SEC has overreached in its mischaracterization of the "authorization" GEL was granted and has gone on to draw improper legal conclusions therefrom.

The Complaint provides:

¶32.    After a customer deposited their penny stocks or other securities into one of GEL's custodian accounts and they were under GEL's control, GEL found executing brokers who were willing to sell the securities in the market through one of GEL's DVP brokerage accounts.

That is, GEL did not sell the shares, but a licensed executing broker did.

¶33.    GEL provided trading instructions on behalf of its customers to the executing brokers and directed the executing brokers to sell the securities. As alleged in more detail below, these instructions often included directives on price and volume.

In other words, GEL conveyed its customers' specific instructions to a licensed broker.

¶36.    GEL then allocated trading proceeds to the omnibus subaccount associated with the customer. GEL kept internal records to track securities from the settled trades to its customers' accounts, which corresponded to the GEL-controlled subaccounts.

This paragraph details GEL's primary function, which is to keep internal records of the trading its customers directed the licensed executing brokers to do. There is no contention that they fulfilled this record keeping function improperly.

¶37.    After GEL directed the funds to the subaccount, ***GEL followed instructions from its customers*** for wiring the trading proceeds to the customers' bank accounts. GEL wired hundreds of millions of dollars in customer trading proceeds to customer bank accounts or to third-party bank accounts on behalf of its customers.

(***emphasis added***) Here, the SEC concedes that GEL was following its customers instructions.

> ¶40.    Between approximately June 2019 and May 2022, GEL executed more than 19,000 trades of more than 300 billion shares of stock of more than 400 issuers on behalf of approximately 60 customers. These trades generated more than $1.2 billion of trading proceeds for GEL's customers.

Here, the Complaint earlier has contradicted this conclusion, as it explained earlier that it was licensed executing brokers and not GEL that executed those trades. This paragraph, however, does explain that the proceeds went to GEL's customers. Thus, disgorgement is not necessary.

C.    Defendants Directed Trading in Securities. ¶41-¶45

In these paragraphs, the Complaint cites what appear to be specific examples of communications between GEL and licensed executing brokers. In each paragraph in this section, however, there are allegations that GEL is somehow not conveying the customers' own instructions to the licensed broker as the Complaint earlier admitted in ¶37.

D.    Galvani and Jeffery Directly Participated in and Controlled the Enterprise. ¶46-¶49

In these paragraphs, the Complaint alleges that Galvani and Jeffery own and controlled GEL. However, as the Complaint admitted earlier in ¶15 and ¶24, they were registered brokers, affiliated with a registered broker.

E.    Defendants Received Transaction-Based Compensation (¶50-¶56)

In these paragraphs the Complaint alleges a series of minor set fees, like the $30 fee for each trade, and then attempts to conclude that these minor set fees are effectively the same as typical broker commissions, which of course are far greater and structured differently.

<u>Summary of Above Paragraphs</u>

Therefore, we can glean the following factual background from the Complaint:

- GEL bought no shares at issue;

- GEL sold no shares at issue;

- All sales were performed by licensed broker-dealers;

- GEL conveyed its customer's directions;

- GEL properly kept records;

- GEL was affiliated with a licensed broker-dealer;

- Galvani and Jeffery were licensed brokers;

- No customer lost any money, so nothing exists to disgorge;

- GEL acted to follow the SEC (mistaken) interpretation that its activities require registration, and thus no deterrent-based relief is necessary.

## **LEGAL STANDARD**

The Supreme Court's decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) governs motions to dismiss for failure to state a claim under FRCP 12(b)(6), which holds a Court must apply a "'plausibility standard,' guided by '[t]wo working principles…' 550 U.S. at 544. First, although "a court must accept as true all of the allegations contained in a complaint," however, that 'tenet' 'is inapplicable to legal conclusions." *Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir., 2009) *citing Bell Atlantic Corp.,* 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citation omitted)  Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris,* 572 F.3d at 71-72.

Plaintiff must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Northwell Health, Inc. v. Lexington Insurance Company*, 550 F.Supp.3d 108, 115 (S.D.N.Y., 2021) *citing Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim for relief is facially plausible when the complaint goes beyond facts that are "merely consistent with" liability and "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When analyzing a motion to dismiss, the Court "<u>sets aside conclusory allegations and 'threadbare recitals of the elements of a cause of action</u>,' but accepts all remaining factual allegations as true..." *Northwell Health, Inc.* 550 F.Supp.3d at 115; citing *Harris* 572 F.3d at 72 (emphasis added).

## ARGUMENT

### 1. The SEC Has Not Set Forth a Plausible Claim that Defendants Were "Brokers" Therefore There is No Viable Claim Under Section 15(a)

Section 15(a) of the Exchange Act makes it unlawful for "a broker to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security, unless such broker: (1) is registered with the Commission; (2) in the case of a natural person, is an associated person of a registered broker; or (3) satisfies the conditions for an exemption or safe harbor." *S.E.C. v. StratoComm Corp.,* 2 F.Supp.3d 240, 262 (N.D.N.Y. 2014). However, a prerequisite to that section is the presumption that the individual or entity in question is actually a broker. GEL was not acting as a "broker" thus, Section 15(a) does not apply to GEL or its principals.

Section 3(a)(4) the Exchange Act defines "broker" as any person "engaged in the business of effecting transactions in securities for the account of others." *See, e.g. SEC v. Martino,* 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003). Because neither "engaged in the business" or "effecting transactions" is defined, Courts have established a number of factors to determine whether an individual was acting as a "broker." The most frequently cited factors, identified in *S.E.C. v.*

*Hansen*, consist of whether a person "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." *SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. 1984); *see also see also S.E.C. v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y., 2003).

The Court in *Hansen* concluded that the defendant was a "broker" who violated Section 15(a) based on the facts that defendant (1) worked as a consultant rather than an employee of the issuer; (2) received a commission based on his sale of each oil well interest (15%); (2) actively and aggressively sought investors, by preparing letters that "extolled the virtues" of the investment; advertising in newspapers; sponsoring seminars and social events, distributing gifts and promotional items; participated in a financial symposium, hiring employees and providing prepared scripts for those employees' telephone calls to prospective investors; (3) provided frequent and extensive advice as to the merit of the investment; (4) sold the securities of another issuer in the past; and (5) sought and failed to obtain broker registration because of prior securities law violations. *SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. 1984).

The instant case is distinguishable from *Hansen*. Based on the allegations of the Complaint, GEL (1) did not work for the issuers, or as a consultant, but functioned as an admin, by relaying information from client to an executing broker (2) received commission based upon transactions in a fixed amount of $36 per securities transaction (*see* Exhibit A), (3) provided no advice or direction as to investments (4) did not sell securities for any issuer and (5) its principals were affiliated with a registered broker-dealer and registered GEL as an OSJ.

In *Martino*, the Court held that defendants were brokers because they (1) "actively sought investors" (2) "assisted in negotiating the stock sales at issue." *S.E.C. v. Martino,* 255 F.Supp.2d at 284. Conversely, in this case, (1) the SEC does not allege that the GEL defendants ever solicited companies to purchase or sell stock (2) the SEC concedes that GEL acted only upon instruction directly from clients and did not negotiate the sale price or have any influence whatsoever over client directives. (The only allegation to support that GEL had any "trade authority" is based on a mischaracterization of a New Client Account Application, which upon reading the entirety of the document is clearly unfounded.)

Moreover, in both *Hansen* and in *Martino,* there was no evidence that the transactions themselves were being conducted by an "executing broker." In the instant case, the SEC alleges all of the trading activity complained of was actually handled by a licensed executing broker. Complaint ¶ 33.

Ultimately, without the requisite factual allegations to substantiate that GEL acted as a "broker" at all, there can be no claim for failure to be hold a broker's license. The SEC is attempting to fit a round peg into a square hole. GEL is effectively accused of violating a rule that is not applicable to its business model or activities. The SEC contends that brokers must be properly licensed, but the Complaint fails to connect the dots with respect to why this rule applies to GEL and its principals. It relies on conclusory statements of law, rather than facts. To the extent the Complaint even tries to do so, it relies heavily on word like "facilitate." Yet that is insufficient to conclude Defendants acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)].

 2. **GEL's Business Model As Described By The SEC Does Not Require Registration as a Broker**

There are many actors within the securities space who are not required to be licensed broker-dealers. These include lawyers, secretaries, businessmen, *etc*. What these individuals and GEL have in common is that despite having a fiduciary responsibility to their clients, they are not responsible for "effecting transactions in securities for the account of others." The SEC Complaint admits "GEL's customers -- and not GEL -- owned virtually all of the penny stocks and other securities". C¶39 GEL accepted instructions only from Authorized Individuals of the clients. Galvani Aff. ¶ Ex. A. Then GEL "found executing brokers … to sell the securities in the market…" C¶32.

While case law in New York is limited on the subject, in *S.E.C. v. M & A West, Inc.,* 2005 WL 1514101 (N.D. Cal. 2005), a Court granted summary judgment *sua sponte* in favor of a defendant on the SEC's Section 15(a) claim. The Court held that it was undisputed that while defendant "facilitated" and participated in several reverse mergers, worked with the shareholders (1) to identify suitable public shell companies, (2) prepare documents for the reverse merger, and (3) to co-ordinate the parties to the reverse merger. Upon successful completion of a reverse merger, the defendant received compensation in cash and securities. Rejecting the Commission's argument that the defendant's conduct amounted to broker activity, *M & A West* held that:

> Th[e] [Commission's] factual recitation capped with an ipse dixit sheds no light on why [the defendant]'s activities—commonly associated with paralegals (who draft documents), lawyers (who draft documents and orchestrate transactions), businessmen (who identify potential merger partners) and opportunists (who like to take a small cut of a big transaction), none of whom is commonly regarded as a broker—add up to [the defendant's] being a broker. In particular, no assets were entrusted to [the defendant], and the Commission identifies no evidence that he was authorized to transact "for the account of others" (aside from his fiduciary authority over [the] accounts [of entities controlled by him]). Although [the defendant] was in the business of facilitating securities transactions among other persons, the Commission cites no authority for the proposition that this equates to "effecting transactions in securities for the account of others."

*S.E.C. v. M & A West, Inc.,* 2005 WL 1514101 (N.D. Cal. 2005).

This case is far more in line with the facts complained of herein by the SEC than *Hansen* or *Martino*. The Complaint's factual allegations lay out GEL's activities, which including acting in an administrative capacity, connecting clients (who already owned shares) with executing brokers (who sold those shares on the client's behalf). GEL, while it maintained a fiduciary responsibility over accounts of its clients, had no authority to effect transactions in securities for the account of others. *See* Galvani Decl. Ex. A.

Following *M & A West,* a series of cases identified a limited, so-called "finder's exception" that permits a person or entity to "'perform a narrow scope of activities without triggering the b[r]oker/dealer registration requirements.'" *Salamon v. Teleplus Enterprises, Inc.,* 2008 WL 2277094, *8 (D.N.J.2008) (Walls, J.) (quoting *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures,* 2006 WL 2620985 at *6 (D.Neb.,2006); *Salamon v. CirTran Corp.,* 2005 WL 3132343, *2–*3 (D. Utah 2005) (Stewart, J.). "Merely bringing together the parties to transactions, even those involving the purchase and sale of securities, is not enough" to warrant broker registration under Section 15(a). *Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.,* 2009 WL 2777869, *3 (N.D. Tex. 2009) (Lynn, J.). Rather, the evidence must demonstrate involvement at "key points in the chain of distribution," such as participating in the negotiation, analyzing the issuer's financial needs, discussing the details of the transaction, and recommending an investment. *Cornhusker,* 2006 WL 2620985 at *6. Here, there is no allegation submitted by the SEC that GEL was negotiating, analysis, or involvement in the Client's decisions.

Even if the "finder" receives a fee "in proportion to the amount of the sale"—*i.e.,* a percentage of the total payment rather than a flat fee—the Commission (in a series of "no-action" letters) "has been willing to find that there was no need for registration ...." DAVID A. LIPTON,

15 BROKER–DEALER REGULATION § 1:18 (explaining, however, that payment of a flat fee "does not insure that the payment will be regarded as non[-]commission compensation."). While SEC no-action letters are not binding on New York courts, they are widely regarded as persuasive authority. *Schatzki v. Weiser Capital Management, LLC*, 2016 WL 6662264, at *5 (S.D.N.Y., 2016) *citing SEC v. Kern,* 425 F.3d 143, 151 n.5 (2d Cir. 2005) (other citations omitted). Notably, in GEL's case, GEL received a flat fee of $30.00 per transaction as opposed to a "cut" of the deal. C¶53.

The facts underpinning the exceptions outlined in these Section 15(a) cases from around the country, are akin to the activities of GEL described in the SEC's complaint here. Thus, despite serving a ministerial or "facilitator's" role in the securities industry, GEL was not required to be a registered broker under Section 15(a), and the claims against defendants must be dismissed accordingly.

### 3. Despite No Requirement That They Do So, GEL and its Principals Were Registered During the Transactions In Question

The SEC admits but glosses over what is perhaps the most important factor in the Court's analysis to distinguish this case from other cases brought under Section 15(a) by the SEC. The SEC hangs its hat on the caveat that the entity GEL was not only acting as a broker (a fact we contend is not plausible given the SEC's threadbare allegations and conclusory recitations of law) but also that GEL was not licensed. The Complaint admits GEL and GEL's principals *were* affiliated with a registered broker-dealer. *See* Complaint ¶ 24. This is supported by public filings, including the parties' BrokerCheck Reports. Galvani Decl., Exs. B, C and D.[3] In light of these

---

[3] "When allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true on a motion to dismiss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A.

exhibits, it is wholly unclear from the Complaint what else the SEC wants, and why they conclude this registration is insufficient.

Section 15(a)(1) provides:

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person <u>not associated with a broker or dealer</u> …to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section.

*S.E.C. v. Kramer*, 778 F.Supp.2d 1320, 1333 (M.D. Fla., 2011). Where the SEC has admitted that GEL's principals were affiliated with a registered broker-dealer, the SEC has failed to state a claim against them for violating Section 15(a) and Section 20 as a result.

## <u>CONCLUSION</u>

Ultimately, the SEC has failed to articulate sufficient factual allegations to state a cause of action against GEL or its principals. For all of the foregoing reasons, we respectfully request that this Court grant Defendants' motion to dismiss.

Dated:  New York, New York
February 3, 2023

Respectfully submitted,

PULLP

By: _____
Jonathan Uretsky
Anna Adelstein
*Attorneys for Defendants*
111 Broadway, 8th Floor
New York, New York  10006
(212)  571-1255
uretsky@pullp.com
adelstein@pullp.com

---

§ 78j(b); 17 C.F.R. § 240.10b–5." *In re Silvercorp Metals, Inc. Securities Litigation,* 26 F.Supp.3d 266 (S.D.N.Y., 2014). Similarly here, where allegations of violation of Securities law contradict publicly filed documents, those documents should control.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 3, 2023, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

PULLP

By: /s/ Jonathan Uretsky
Jonathan Uretsky
Anna Adelstein
*Attorneys for Defendants*
111 Broadway, 8th Floor
New York, New York 10006
(212) 571-1255
uretsky@pullp.com
adelstein@pullp.com