**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

GEL DIRECT TRUST,
GEL DIRECT, LLC,
JEFFREY K. GALVANI,
STUART A. JEFFERY,

Defendants.

Civ. Action No. 1:22-cv-09803-JSR

**JURY TRIAL DEMANDED**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Keefe M. Bernstein*
Derek B. Kleinmann*

*Admitted *pro hac vice*

Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: (817) 900-2607 (Bernstein)
bernsteink@sec.gov
Tel: (817) 900-2623 (Kleinmann)
kleinmannd@sec.gov

February 24, 2023

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii-iv

I.      Preliminary Statement ........................................................................................ 1

II.     Background ........................................................................................................... 2

III.    The Complaint's Factual Allegations ................................................................ 3

IV.     Standard of Review ............................................................................................. 7

V.      Argument and Authorities ................................................................................. 8

        A.      The Complaint Plausibly Alleges That Defendants Are Brokers ............................. 8

                1.      The Complaint alleges regular particpiation and other broker conduct ............ 9

                2.      Courts have repeatedly found similar conduct more than sufficient to
                        state a Section 15(a) claim ............................................................................. 11

        B.      The Complaint Plausibly Alleges That Defendants Were Not Registered. ............. 13

                1.      The entity Defendants were not registered. ..................................................... 13

                2.      The individual Defendants were not registered. .............................................. 14

        C.      No Finders Exception Applies. ...................................................................................... 15

        D.      The SEC Is Entitled to Seek a Disgorgement Remedy ............................................ 16

VI.     Conclusion ............................................................................................................ 17

## TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................ 7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................ 7

*Celsion Corp v. Stearns Mgmt. Corp.,*
   157 F. Supp. 2d 942 ....................................................................... 2, 8

*Dillon v. Militano,*
   731 F. Supp. 634 (S.D.N.Y. 1990) ................................................... 3

*Federal Ins. Co. v. Gander & White Shipping, Inc.,*
   2020 WL 3833408 (S.D.N.Y. July 8, 2020) ................................... 7

*Goldman v. Belden,*
   754 F.2d 1059 (2d Cir. 1985) .......................................................... 7

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) ................................................................... 16

*Regional Props. v. Financial & Real Estate Consulting, Co,*
   678 F.2d 552 (5th Cir. 1982) ........................................................... 2

*Roth v. Jennings,*
   489 F.3d 499 (2d Cir. 2007) ............................................................ 7

*Roth v. SEC,*
   22 F.3d 1108 (D.C. Cir. 1994) ...................................................... 14

*SEC v. Art Intellect, Inc.,*
   2013 WL 840048 (D. Utah Mar. 6, 2013) .................................. 9, 11

*SEC v. Battoo,*
   158 F. Supp. 3d 676 .................................................................. 8, 9, 13

*SEC v. Benger,*
   697 F. Supp. 2d 932 (N.D. Ill. 2010) ............................... 8, 9, 12, 13, 15

*SEC v. Church-Koegel,*
   2021 WL 6104157 (C.D. Cal. Sept. 20, 2021) .............................. 16

*SEC v. Global Investment Strategy UK Ltd.,*
   2021 WL 4896127 (S.D.N.Y. Oct. 19, 2021) ............................ 12, 13

*SEC v. Hansen,*

    1984 WL 2413 (S.D.N.Y April 6, 1984) .......................................................... 8, 11

*SEC v. Helms,*
    2015 WL 6438872 (W.D. Tex. Oct. 20, 2015) ...................................................... 15

*SEC v. Kenton Cap., Ltd.*,
    69 F. Supp. 2d 1 (D.D.C. 1998) ........................................................................... 8, 10

*SEC v. Levin,*
    232 F.R.D. 619 (C.D. Cal. Aug. 15, 2005) ........................................................... 16

*SEC v. M & West, Inc.,*
    2005 WL 1514101 (N.D. Cal June 20, 2005) ....................................................... 15

*SEC v. Margolin,*
    1992 WL 279735 (S.D.N.Y. Sept. 30, 1992) ............................... 8-9, 10, 11, 12, 13

*SEC v. Martino,*
    255 F. Supp. 2d 268 (S.D.N.Y. 2003), *aff'd,* 7 F.3d 220 (2d Cir. 1993)................. 8

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990) ............................................................................... 14

*SEC v. Vazquez,*
    2019 WL 8167922 (C.D. Ca.  Dec. 11, 2019) ...................................................... 14

*VanCook v. SEC*,
    653 F.3d 130 (2nd Cir. 2011) ................................................................................ 3

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2nd Cir. 2011) ................................................................................ 7

**Statutes and Rules**

Securities Exchange Act of 1934:

    Section 3(a)(4) [15 U.S.C. § 78c (a)(4)] ............................................................... 8

    Section 15(a) [15 U.S.C. § 78o(a)] ......................................... 2, 7, 8, 11, 12, 13, 14

    Section 21(d)(7) [15 U.S.C. § 78u(d)(7)] ............................................................ 16

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 7

Fed. R. Civ. P. 9(b) .................................................................................................... 8

**Other**

*BondGlobe, Inc.,* SEC Denial of No-Action Letter
    2001 WL 103418 (Feb. 6, 2001) ......................................................................... 11

https://www.finra.org/rules-guidance/rulebooks/finra-rules/7210a.................................3

Plaintiff Securities and Exchange Commission ("SEC") files this Memorandum of Law in Opposition to the Motion to Dismiss the Complaint of Defendants GEL Direct Trust ("GEL"), GEL Direct, LLC ("GEL Trustee"), Jeffrey K. Galvani ("Galvani"), and Stuart A. Jeffery ("Jeffery") (collectively, "Defendants").

## I. PRELIMINARY STATEMENT

The SEC's Complaint (Dkt. 1) alleges that Defendants obtained more than $12.4 million in compensation from funneling approximately $1.2 billion of penny stocks into the public markets on behalf of GEL's customers without regulatory oversight and in direct violation of the broker registration requirements of the federal securities laws. Defendants ask the Court to dismiss the Complaint, arguing that Defendants are not brokers because GEL is not the one actually buying or selling the securities and, if even they are brokers, Defendants did not have to register because Jeffery and Galvani were associated with a registered broker-dealer. Neither argument has merit.

The broker registration provisions cover far more conduct than only that of brokers that execute purchases or sales. Indeed, large segments of the regulated brokerage industry provide services to facilitate the consummation of securities transactions other than executing buy or sell orders. Under applicable law, any person who participates in securities transactions at key points in the chain of distribution is a broker and must register.

The Complaint more than plausibly alleges that Defendants participated in securities transactions at key points in the chain of distribution, including: (a) taking custody and control of customer securities; (b) accepting trades from customers; (c) finding and directing executing brokers on the terms of selling the securities (which were sold in GEL's name though GEL trading accounts); (d) settling trade proceeds at GEL's custodian accounts; and (e) allocating and transferring those proceeds to customers.

The Complaint further alleges that many of the additional factors indicative of brokerage activity are also present here. Defendants: (a) received transaction-based compensation; (b) handled securities and funds of others in connection with securities transactions; (c) processed documents related to the sale of securities; (d) participated in the order-taking and order-routing process; (e) effectuated sales for multiple issuers for many years; (f) were not employees of the issuers; and (g) solicited customers for their securities business.

Defendants' argument that the individual Defendants' association with a registered broker-dealer exempts them from registration also fails. The Complaint alleges that GEL and GEL Trustee have never been registered, and entities (as opposed to natural persons) cannot associate. Galvani and Jeffery were associated with a registered firm. However, they conducted GEL as an "outside business activity," and the registered firm did not supervise GEL's trading activities. The individual Defendants' association with the registered firm therefore does not cover their conduct at issue.

The Complaint's allegations, when accepted as true, state plausible and well-pleaded claims for violations of the broker registration requirement set forth in Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.     BACKGROUND

The broker registration requirements are "of the utmost importance in effecting the purposes of the [Exchange] Act" because they enable the SEC "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *Celsion Corp. v. Stearns Mgmt. Corp.,* 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (citing *Regional Props. v. Financial & Real Estate Consulting, Co.,* 678

F.2d 552, 562 (5th Cir. 1982)).  Brokers are integral to the U.S. securities markets.

There are many different types of brokers.  For example, there are introducing brokers that typically deal directly with customers, originate customer accounts, and accept orders from customers but do not usually execute trades.  *See generally VanCook v. SEC*, 653 F.3d 130, 133 (2nd Cir. 2011); *Dillon v. Militano,* 731 F. Supp. 634, 636 (S.D.N.Y. 1990).  Introducing brokers often send or "introduce" their customers' trades to a clearing broker or an executing broker.  Clearing brokers handle functions related to the clearance and settlement of trades, in some cases provide other back office services, and often also execute trades.  *See generally VanCook*, 653 F.3d at 133; *Dillon* 731 F. Supp. at 636.  Executing brokers execute trades, which are cleared through a clearing broker.  *See, e.g.,* [https://www.finra.org/rules-guidance/rulebooks/finra-rules/7210a](https://www.finra.org/rules-guidance/rulebooks/finra-rules/7210a).  Other brokers offer some hybrid of these services or other services.

As discussed below, broker activity covers a wide range of conduct, and any individual or firm that regularly participates in securities transactions at key points in the chain of distribution is a broker under the Exchange Act irrespective of whether they are the ones executing the purchase or sale of securities in the market.

### III.    THE COMPLAINT'S FACTUAL ALLEGATIONS

Defendants have engaged in the business of selling penny stocks and other securities for the accounts of GEL's customers without being registered as brokers or being associated with a registered broker.  Complaint at ¶ 1.  Among other actions, GEL: (a) takes possession of its customers' penny stocks; (b) finds executing brokers willing to sell the stocks in the market; (c) directs the executing brokers on completing the sales; and (d) facilitates the settlement of the trades and disbursement of proceeds to its customers.  *Id.* at ¶ 3

Galvani and Jeffery have worked in the securities industry for many years and are affiliated as registered representatives at the same registered broker-dealer.  Complaint at ¶ 15. In approximately early 2019, they formed GEL, which they co-own and control, as a new financial firm *outside of their affiliation with the registered broker-dealer*.  *Id.* at ¶¶ 16-18, 46.

Galvani and Jeffery established GEL as a firm that could facilitate securities transactions for its customers by, among other things: (i) assisting in executing, clearing, and settling securities transaction; (ii) accepting, routing, matching, or otherwise handling customer orders; and (iii) handling customer funds and securities.  *Id.* at ¶ 19.

GEL, acting through Galvani and Jeffrey, found and obtained customers for the new firm. *Id.* at ¶ 20.  As of May 2022, GEL had opened accounts for approximately 60 customers.  *Id.*

Every GEL customer was required to fill out an account application confirming that GEL would have trading authorization over the customer's securities.  *Id.* at ¶ 26.[1]

GEL sent customers a welcome packet that stated that customers would use: (1) "the following form to authorize the transfer of assets, currently at another firm, to your *brokerage account* held at GEL[;]" (2) provided a deposit checklist to ensure that customers could transfer their securities to GEL; and (3) required customers to set up an account for GEL to wire their trading proceeds.  *Id.* at ¶ 28 (emphasis added).  Several GEL customers also provided

---

[1] Defendants' contention that the Complaint misstates the account application misses the point. Motion at 9-10.  Whichever way the quoted sentence is read, the account application gave GEL trading authorization to accept trades from customers or their authorized representatives.  Motion at 9.  GEL provided these trades to executing brokers who executed them as GEL trades at GEL's direction and with no visibility about GEL's customers.  Complaint at ¶¶ 31-33; 41-44. Customers authorized GEL to make those trades, whether directly or at the instruction of their authorized agents, unless of course Defendants contend that they directed over $1 billion in unauthorized trades.  If Defendants contend that the SEC purports to construe the application's language to claim that customers granted GEL discretionary trading authority (*e.g.,* akin to certain investment advisers), then they misinterpret the allegation.  However, GEL did, in practice, exercise discretion over many of the trades.  *Id.* at ¶¶ 33; 41-45.

documents to GEL confirming their understanding that they were opening a "brokerage account" with GEL and that GEL would provide broker-dealer services. *Id.* at ¶ 27.

GEL established omnibus accounts in its name at a trust company and other financial institutions to hold its customer's trading proceeds and GEL's fees. *Id.* at ¶ 29. The omnibus accounts had sub-accounts associated with each customer. *Id.* GEL controlled the omnibus accounts and the subaccounts. *Id.*

GEL established custodian accounts in its name at several financial institutions. *Id.* at ¶ 30. Following GEL's instructions, GEL's customers deposited their penny stocks and other securities into the custodian accounts, thereby giving GEL control over the handling and disposition of its customers' securities. *Id.* at ¶ 30.

GEL also established approximately 20 delivery-versus-payment ("DVP") brokerage accounts at domestic and offshore brokerage firms, which GEL used to place trades to sell its customers' securities. *Id.* at ¶ 31. Specifically, after a customer deposited their penny stocks into one of GEL's custodian accounts and they were under GEL's control, GEL found executing brokers willing to sell the securities in the market through one of GEL's DVP brokerage accounts. *Id.* at ¶ 32.

On behalf of its customers, GEL provided trading instructions to the executing brokers and directed the executing brokers to sell the securities. *Id.* at ¶ 33. These trade instructions often included specific directives to the executing brokers on price and volume, and GEL also exercised discretion over many of the trades it directed on its customers behalf. *Id.* at ¶¶ 33; 41-45 (providing specific examples). The shares were sold out of GEL accounts (not customer accounts), and GEL told the executing brokers that GEL was entering the trades. *See, e.g., Id.* at ¶¶ 34, 45.

The executing broker then sold the securities based on GEL's instructions, typically by placing trades in the U.S. over-the-counter market. *Id.* at ¶ 34. After an executing broker sold the securities through one of GEL's DVP accounts, the funds settled at one of GEL's custodian accounts. *Id.* Thereafter, GEL continued to facilitate the settlement process. *Id.* at ¶ 34. GEL would transfer the settled funds from GEL's custodian account to a GEL omnibus account, allocate trading proceeds to the GEL subaccount associated with the customer, and then wire the trading proceeds to the customers' bank accounts. *Id.* at ¶¶ 35-37.

In exchange for these services, GEL received compensation from its customers, including transaction-based compensation. *Id.* at ¶ 50. Among other fees, GEL charged a transaction-based fee for each deposit of securities the customer made with GEL for GEL to sell through the executing brokers; a trade-settlement fee each time it completed a trade on behalf of a customer; and other fees related to brokerage-type services (*e.g.*, rush fees for expedited trades). *Id.* at ¶¶ 52-54. Each month, GEL collected these fees from its customers, which account documents referred to as "commissions." *Id.* at ¶ 55.

Between approximately June 2019 and May 2022, GEL executed more than 19,000 trades of more than 300 billion shares of stock of more than 400 issuers on behalf of approximately 60 customers. *Id.* at ¶ 40. These trades generated more than $1.2 billion in trading proceeds for GEL's customers, and more than $12.4 million dollars in fees for GEL from its customers. *Id.* at ¶¶ 40, 55. The vast majority of GEL's trading activity related to the sale of penny stocks. *Id.* at ¶ 21.

GEL's customers (and not GEL) owned virtually all of the penny stocks and other securities that GEL traded through its custodian and DVP brokerage accounts. *Id.* at ¶ 39. Yet, neither GEL nor GEL Trustee has ever been registered as a broker. *Id.* at ¶ 22.

Further, from at least June 2019 to May 2022, Galvani and Jeffery conducted GEL's and GEL Trustee's business without any affiliation with a registered broker-dealer. *Id.* at ¶ 23. Their GEL-related activities were conducted separate and apart from their affiliation with a broker-dealer, and Galvani and Jeffery listed their GEL-related activities as "Other Business Activities" that were separate and apart from their affiliation with that broker-dealer. *Id.* at ¶ 24.[2]

In February 2022, for the first time, Galvani and Jeffery attempted to include their GEL-related activities with their affiliated broker-dealer. *Id.* at ¶ 25. However, the broker-dealer did not supervise any of GEL's trading activity before May 2022, at the earliest. *Id.*

## IV.    STANDARD OF REVIEW

To withstand a motion to dismiss under FED. R. CIV. P. 12(b)(6), the SEC need allege only "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'" *Federal Ins. Co. v. Gander & White Shipping, Inc.*, No. 19 Civ. 7209 (ALC), 2020 WL 3833408, at *1 (S.D.N.Y. July 8, 2020) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). The Court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2nd Cir. 2011) (internal citation omitted). In ruling on a motion to dismiss, a district court normally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). In

---

[2] As discussed at Section B below, an individual's association with a registered broker-dealer does not satisfy the individual's Section 15(a) registration requirement for business conducted outside of the employment relationship with the broker-dealer.

addition, the SEC has not alleged a fraud claim in this case, and the particularity requirements of

FED. R. CIV. P. 9(b) therefore do not apply.  FED. R. CIV. P. 9(b)

## V.      ARGUMENT AND AUTHORITIES

### A.  The Complaint Plausibly Alleges That Defendants Are Brokers.

Section 15(a) of the Exchange Act imposes strict liability for brokers that fail to register

with the SEC.  *Celsion Corp.*, 157 F. Supp. 2d at 947; *SEC v. Martino*, 255 F. Supp. 2d 268, 283

(S.D.N.Y. 2003) (scienter is not required to violate Section 15(a)).

Section 3(a)(4) of the Exchange Act defines a "broker" as "any person engaged in the

business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4).

To determine whether an individual or entity falls within this definition, courts consider whether

the person's conduct "may be characterized by a certain regularity of participation in securities

transactions at key points in the chain of distribution."  *Martino*, 255 F. Supp. 2d at 283 (internal

quotation omitted); *see also SEC v. Kenton Cap., Ltd.,* 69 F. Supp. 2d 1, 12-13 (D.D.C. 1998)

(regularity of participation is the primary indicia).

Courts also consider a variety of conduct as indicative of broker activity, including, but

not limited to, whether the person: (1) actively solicits investors; (2) receives transaction-based

compensation; (3) handles securities or funds of others in connection with securities transactions;

(4) processes documents related to the sale of securities; (5) participates in the order-taking or

order-routing process; (6) sells, or previously sold, securities of other issuers; (7) is an employee

of the issuer; (8) is involved in negotiations between the issuer and the investor; or (9) makes

valuations as to the merits of the investment or gives advice.  *See, e.g., SEC v. Hansen*, No. 83

Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y April 6, 1984) (referring to factors 1,2, 6, 7, 8, 9);

*SEC v. Battoo*, 158 F. Supp. 3d 676, 695 and n.15 (N.D. Il. 2016) (referring to factors 1, 2, 3, 4,

6, 7, 8, 9) (citing *SEC v. Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010)); *SEC v. Margolin*,

No. 92 Civ. 6307, 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992), *aff'd*, 7 F.3d 220 (2d Cir.

1993) (referring to factors 1, 2 and 3); *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL

840048, at *20 (D. Utah Mar. 6, 2013) (referring to factors 1, 2, 3, 5, and 8).

However, no one factor is determinative, and not all of the factors will apply to the facts

and circumstances of each case.  *See Battoo*, 158 F. Supp. 3d at 695 ("This list is by no means

exhaustive; rather, the inquiry focuses on whether the alleged broker 'facilitated the

consummation of [securities] sales'") (citing *Benger*, 697 F.Supp. 2d at 945).

### 1. The Complaint alleges regular participation and other broker conduct.

The Complaint more than plausibly alleges that the Defendants regularly participated in

securities transactions at key points in the chain of distribution.  As the flow chart in the

Complaint illustrates, Defendants participated at essentially every key point in the chain except

the initial purchase of the securities (typically in a private transaction), and the execution of the

sale in the market.  Complaint at ¶ 38.[3]  Specifically, Defendants took custody and control of its

customers' securities, established DVP accounts in GEL's name to trade the securities, accepted

trades from customers, found and then directed executing brokers on the terms of selling the

securities, settled trade proceeds in a GEL custodian account, and allocated and transferred those

proceeds to customers.  Complaint at ¶¶ 19, 29-37.

Further, Defendants' participation was not infrequent or isolated.  To the contrary, this

was GEL's business, and it involved more than 19,000 trades of more than 300 billion shares of

stock of more than 400 issuers that generated more than $1.2 billion of trading proceeds for

---

[3] Defendants repeatedly argue they were not involved in the initial purchase of their customers' securities and did not execute the final sales. *See, e.g.,* Motion at 5, 8.  However, Defendants cannot credibly claim that either is a requirement for being a broker, or that the Complaint does not allege that Defendants regularly participated in multiple key points in the chain of distribution, including critical functions to facilitate the sales.

approximately 60 GEL customers. Complaint at ¶ 40; *see also Kenton Cap., Ltd.*, 69 F. Supp. 2d at 13 (regularity of participation demonstrated as a matter of law where defendants received pledges to invest from more than 40 individuals for a total of $17.5 million and actually collected money from 12 investors for a total of $1.8 million); *Margolin*, 1992 WL 279735, at *5 (finding regularity of participation because defendant provided clearing services in dozens of transactions for various clients).

In addition to the detailed allegations supporting the primary indicia – that Defendants regularly participated in securities transactions at key points in the chain of distribution – the Complaint further alleges that Defendants engaged in many of the types of conduct that courts have found are indicative of broker activity. Specifically:

- Defendants received transaction-based compensation. Complaint at ¶¶ 50, 52-53.

- Defendants handled securities and funds of others in connection with securities transactions. *Id.* at ¶¶ 28-30, 34-38.

- Defendants processed documents related to the sale of securities. *Id.* at ¶¶ 28, 35-37.

- Defendants participated in the order-taking or order-routing process. *Id.* at ¶¶ 33, 38, 41-45.

- Defendants effectuated the sale of securities for multiple issuers for many years, and directed executing brokers on the terms of those sales. *Id.* at ¶¶ 33, 40, 41-45.

- Defendants were not employees of the issuers. *Id.* at ¶ 15-16.

- Defendants solicited customers. Complaint at ¶¶ 3, 19, 20, 27-28.

With respect to the last factor, Defendants incorrectly state that the Complaint concedes they were not soliciting, because it does not allege GEL was involved in their customers' initial purchase of their shares. Motion at 8. Admittedly, the Complaint does not allege, for example,

that Defendants were cold calling investors to purchase stock. However, there are many other ways to solicit. Defendants' business model was premised on a different part of the chain of distribution – inducing securities transactions by soliciting an ongoing securities-business relationship with customers who would transfer and sell their securities through a brokerage account at GEL. Complaint at ¶¶ 3, 19, 27-28. To that end, Defendants held themselves out as a brokerage firm, found customers, and opened approximately 60 customer accounts. *Id.* at ¶¶ 20, 27-28; *see also Margolin*, 1992 WL 279735, at *5 (advertising for clients is evidence of brokerage activity).

Defendants also claim that they were only following their customers' instructions when accepting and placing trades through executing brokers, and that they did not have any influence on client directives. *See, e.g.* Motion at 16. This does not help them either. Accepting and routing customer orders is a hallmark of brokerage activity. *See, e.g., BondGlobe, Inc.*, SEC Denial of No-Action Letter, 2001 WL 103418, at *1 (Feb. 6, 2001) ("participating in the order-taking or order-routing process (for example, by taking transaction orders from customers)" is indicative of broker activity); *Art Intellect*, *Inc.*, 2013 WL 840048, at *20 (similar). Further, the Complaint's allegations, which must be accepted as true, are that GEL did in fact exercise discretion over many of the trades. Complaint at ¶¶ 41-45.

2. **Courts have repeatedly found similar conduct more than sufficient to state a Section 15(a) claim.**

The SEC agrees with Defendants that this case is distinguishable from *Hansen*, 1984 WL 2413. Motion at 15. In *Hansen*, the defendant was selling oil and gas interests, not operating a firm providing brokerage services to effect more than a billion dollars in securities trading. *Id.* While Defendants' conduct satisfies some of the non-exclusive *Hansen* factors (*e.g.*, transaction-

based compensation, not employees of the issuer), several of the other factors that courts consider as indicative of brokerage activity better match the facts and circumstances of this case.

For example, the facts in *Benger*, 697 F. Supp. 2d at 932, are analogous. There, the SEC charged an escrow agent who was performing broker activities for failing to register, and the court denied the defendant's motion to dismiss. *Id.* at 943-944. The court held that irrespective of the fact that the escrow agent was not soliciting investors to purchase securities, the SEC had stated a claim that the escrow agent was acting as an unregistered broker-dealer, because he "facilitated the consummation" of securities sales. *Id.* at 945. The court also focused on the fact that the escrow agent: (1) received transaction-based compensation; (2) collected investor funds which he held in escrow before distributing in accordance with distribution and escrow agreements; (3) received and processed documents relating to the sale of securities; (4) communicated with the issuer regarding the receipt of the funds and documents; and (5) sent the investors their share certificates. *Id.*

More recently in this district, the court denied a motion to dismiss in *SEC v. Global Investment Strategy UK Ltd.*, 20 Civ. 10838, 2021 WL 4896127, at *1 (S.D.N.Y. Oct. 19, 2021) (slip copy). The SEC charged a firm that provided clearing and other services to customers for failing to register as a broker. In that case, the customers purchased securities using DVP accounts, then cleared and settled their trades at the defendant's firm and were charged fees of approximately $34 to $55 per trade for these services. *Id.* The Court found that the SEC had stated a Section 15(a) claim, because "the Complaint alleges that [the defendant] performed many of the functions that courts routinely recognize as brokerage activity," including handling customer funds and securities, regularly participating in the securities business, receiving transaction-based compensation, and performing clearing and settlement services. *Id.* at 5.

Similarly, in *Margolin*, 1992 WL 279735, at *1, the defendant provided clearing services in a free-riding trading scheme to deceive executing brokers. The court found that the SEC had made a substantial showing of a likelihood of success on the merits on its Section 15(a) claim, because it established that the defendant provided clearing services to his clients and participated in dozens of transactions for them. *Id.* at *5. The court further found that the defendant had engaged in "other conduct which provided evidence of brokerage activity such as receiving transaction-based compensation, advertising for clients, and possessing client funds and securities." *Id.*

The Complaint plausibly alleges that Defendants, like the defendants in *Benger*, *Global Investment Strategy UK Ltd.,* and *Margolin*, engaged in brokerage activity and "facilitated the consummation of securities sales." *Battoo*, 158 F. Supp. 3d at 695 (internal citation omitted).

### B. The Complaint Plausibly Alleges That Defendants Were Not Registered.

Section 15(a) of the Exchange Act requires brokers to register with the SEC. 15 U.S.C. § 78o(a). If the broker is a natural person, he or she can associate with a registered firm. *Id.* Defendants argue that the SEC has not stated a claim, because Galvani and Jeffery were associated with a broker-dealer. Motion at 6, 7-9, 19-20. This argument has no merit.

#### 1. The entity Defendants were not registered.

The SEC has alleged Section 15(a) claims against GEL and GEL Trustee, and these entities were indisputably not registered.[4] Specifically, the entity Defendants – GEL and GEL Trustee – have never been registered. Complaint at ¶ 23. Further, the Complaint does not contradict or "back off" of this allegation in other parts of the Complaint as Defendants claim.

---

[4] The Complaint also alleges that the individual Defendants are liable as control persons for the entities' violations of Section 15(a). Complaint at ¶¶ 46-49, 63-67. Defendants' Motion does not directly address or seek to dismiss this claim.

Motion at 9.  The Complaint unequivocally alleges that the ***entities*** have never been registered, and makes additional allegations about the ***individuals'*** association with a registered firm (entities cannot associate). 15 U.S.C. § 78o(a).

### 2.  The individual Defendants were not registered.

The individual Defendants – Galvani and Jeffery – are not themselves registered, but are affiliated with a registered broker-dealer.  *Id* at ¶ 24.  However, their GEL-related activities were conducted separate and apart from their affiliation with that broker-dealer.  *Id.*  In fact, Galvani and Jeffery listed their GEL-related activities as "Other Business Activities," thereby affirmatively designating their GEL-related activities as separate and apart from that affiliation. *Id.*  The broker-dealer did not supervise any of GEL's trading activity before May 2022, at the earliest.  *Id* at ¶ 25.

The registration exemption for associated persons is not available, where, as here, the associated persons engage in securities transactions that are not within the scope of their employment with the registered firm and that firm is not supervising the broker activity.  *See, e.g., Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("If an individual is operating as a broker-dealer outside the course and scope of his employment, the employer's registration would seem to have little relevance."); *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (defendant violated Section 15(a) by engaging in securities transactions as part of private bond business of which his registered firm had no knowledge or opportunity to supervise); *SEC v. Vazquez*, SACV 18-00047-CJC, 2019 WL 8167922, at *4 (C.D. Ca.  Dec. 11, 2019) (holding SEC properly stated Section 15(a) claim against associated person, because he was acting outside the scope of his employment with the registered firms).

The Complaint directly and plausibly alleges that the individual Defendants were engaged in brokerage activities *outside the scope of their affiliation with their registered broker-dealer*. Indeed, Defendants apparently concede that Galvani and Jeffery did not seek to have their associated broker-dealer begin supervising the trading activity that they had been conducting through their outside business (GEL) until February 2022, and then only after they became concerned about an SEC enforcement action. Motion at 9. Thus, with respect to the securities transactions at issue, Galvani and Jeffery were not registered with, or an associated person of, a registered firm. Complaint at ¶ 60.

### C. No Finders Exception Applies.

There is no express "finder's exception" to the broker registration requirements in the Exchange Act. Some courts have a found a "very limited" exception to the broker registration requirement where a person or entity acts as merely a finder in bringing together parties to a securities transaction without more. *See SEC v. Helms*, No. A-13-CV-01036, 2015 WL 6438872, at *3 (W.D. Tex. Oct. 20, 2015).

Defendants point to *SEC v. M & West, Inc.*, No. C-01-3376 VRW, 2005 WL 1514101 (N.D. Cal June 20, 2005), to argue that their conduct falls within this very limited exception. Motion at 17-18. However, *M & M West, Inc.* is inapposite. There, the court found that the SEC failed to explain how the defendant's conduct in a reverse merger case was different than, for example, lawyers and business people who work on merger transactions, and the Court was particularly swayed by the fact that "no assets were entrusted to [the defendant], and the Commission identifie[d] no evidence that he was authorized to transact 'for the account of others.'" 2005 WL 1514101, at *9; *see also Benger*, 697 F. Supp. at 945, n.10 (finding defendants reliance on *M & A West, Inc.* unavailing, because "the court found it particularly persuasive that 'no assets were entrusted' to the defendant.")

Here, the Complaint alleges Defendants engaged in extensive broker conduct, including specifically alleging that customer assets were entrusted to GEL and that GEL was authorized to and did transact over a billion dollars in trades for the accounts of its customers.

Defendants then generally point to the series of private action finder cases stating that a broker must do more than merely bring together the parties to transactions and must be involved at "key points in the chain of distribution." Motion at 18. Yet, as discussed above, the Complaint makes detailed allegations establishing that Defendants did more than merely bring together the parties to transactions and were involved in multiple key points in the chain of distribution.

**D. The SEC Is Entitled to Seek a Disgorgement Remedy.**

Defendants' argue without any legal authority that the SEC is not entitled to disgorgement because money was returned to customers. Motion at 7 and 12. This argument is both wrong and untimely. At the outset, the Complaint does not allege that all customer funds have been accounted for and returned. Further, and most importantly, the Complaint does allege that Defendants received substantial compensation as a result of their unregistered brokerage activity, and Defendants' net profits are appropriately subject to disgorgement. *See Liu v. SEC*, 140 S. Ct. 1936, 1939 (2020); 15 U.S.C. § 78u(d)(7). In any event, it is premature to address the SEC's request for the remedy of disgorgement at the pleading stage of the case. *See SEC v. Church-Koegel*, Case No. CV 20-8480, 2021 WL 6104157, at *2 (C.D. Cal. Sept. 20, 2021) (disgorgement is a remedy not an independent claim for relief, and determining whether disgorgement is appropriate is premature at the motion to dismiss stage of litigation); *see also SEC v. Levin,* 232 F.R.D. 619, 625 (C.D. Cal. Aug. 15, 2005) (similar).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's

Motion to Dismiss.  If the Court grants any part of Defendant's Motion, the SEC respectfully

requests leave to amend to address any deficiencies that the Court identifies.

Dated:  February 24, 2023                          Respectfully submitted,


                                                   /s/ Keefe M. Bernstein
                                                   Keefe M. Bernstein*
                                                   Derek B. Kleinmann*

                                                   *Admitted *pro hac vice*

                                                   Securities and Exchange Commission
                                                   801 Cherry Street, Suite 1900
                                                   Fort Worth, Texas 76102
                                                   Tel: (817) 900-2607 (Bernstein)
                                                   bernsteink@sec.gov
                                                   Tel: (817) 900-2623 (Kleinmann)
                                                   kleinmannd@sec.gov