REDACTED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
SECURITIES AND EXCHANGE          :
COMMISSION,

                                 :      No.: 1:22-CV-09803

                                 :      Hon. Jed S. Rakoff

                 Plaintiff,
                                 :

      -against-
                                 :

GEL DIRECT TRUST
GEL DIRECT, LLC                  :
JEFFREY K. GALVANI
STUART A. JEFFERY                :

                 Defendants.
-------------------------------------------------------X


**EXPERT REPORT OF JEFFREY S. HOLIK ON BEHALF OF THE DEFENDANTS**

# TABLE OF CONTENTS

I.   QUALIFICATIONS ........................................................................................................ 4

  A.   Profile.......................................................................................................... 4

  B.   Education ..................................................................................................... 4

  C.   Legal experience ......................................................................................... 4

  D.   Financial Services Industry Experience...................................................... 4

  E.   NASD Regulation/FINRA ........................................................................... 5

  F.   Securities Industry Experience ................................................................... 7

II.  DATA AND INFORMATION CONSIDERED ..................................................... 7

V.   OPINIONS .......................................................................................................... 8

  A.   Background.................................................................................................. 8

  B.   GEL's Business is Novel and not Typical of What the Securities Industry Would
       Consider to be "Broker" Activity ............................................................... 9

  C.   The Custodial Activities at Issue are Properly Supervised under Federal Banking Laws,
       Not by the SEC .......................................................................................... 11

  D.   The Securities Sales at Issue are Already Subject to Regulation by the SEC and FINRA 12

  E.   The SEC Overplays the importance of transaction-based compensation. ........................ 12

# TABLE OF AUTHORITIES

## Authorities

Applied Financial Systems, Inc., SEC No-Action Letter (Sept. 25, 1971).................................... 10

Final Broker Push-Out Rules for Banks – At Long Last, WilmerHale Publication (September 24, 2007) ....................................................................................................................... 12

FINRA Regulatory Notice 21-03, FINRA Urges Firms to Review Their Policies and Procedures Relating to Red Flags of Potential Securities Fraud Involving Low-Priced Securities. ........... 12

SEC, Staff Study on Investment Advisers and Broker-Dealers...................................................... 9

Securities and Exchange Commission, Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and the NASDAQ Market (August 1996). ......... 5

Universal Pensions, Inc., SEC No-Action Letter (Jan. 30, 1998)................................................. 10

Applied Financial Systems, Inc., SEC No-Action Letter (Sept. 25, 1971)………………………10


## Statutes

Exchange Act § 3(a)(4)(A). ........................................................................................................... 9


## Regulations

Regulation R ……………………………………………………………………………………… 11

FINRA Rule 5310 ......................................................................................................................... 12


## Websites

http://portfolioshop.com................................................................................................................ 10

https://gelgroupllc.fixq.com.......................................................................................................... 10

## I. QUALIFICATIONS

### A. Profile

I have 30 years of experience in the financial services industry obtained in a variety of roles and capacities: as an attorney; as a federal regulator with the Commodity Futures Trading Commission and NASD Regulation (predecessor of FINRA); and as Chief Legal Officer for the retail broker-dealer and investment advisor affiliates of a large national bank. My curriculum vitae, a list of publications authored in the past 10 years, and a list of cases in which I have testified at trial or in deposition as an expert in the last five years are attached.

### B. Education

I was awarded a bachelor's degree, summa cum laude, from Union College in 1975, where I was elected Phi Beta Kappa, and a juris doctor degree, with high honors, from The George Washington University Law School in 1978, where I served as Managing Editor of The George Washington Law Review.

### C. Legal experience

Upon graduating law school, I took an associate position in the Washington DC office of Baker & Hostetler, a national law firm. I worked there for approximately eleven years, first as an associate and beginning in 1986 as a partner. From 1989 to 1991, I served as a partner in the Washington DC office of Andrews & Kurth, another national law firm. The focus of my work in private practice concentrated on business, litigation, and government investigative matters.

### D. Financial Services Industry Experience

In 1992, I began a career in financial services. My first position was in the Office of General Counsel at the Commodity Futures Trading Commission ("CFTC"). There, I was responsible primarily for defending Commission enforcement matters in the US Court of Appeals,

and for a variety of advisory activities supporting the Commissioners and their staffs. In 1995, I moved to the Division of Enforcement, where I served as sole Deputy to the Director, with broad responsibilities for developing and executing the Commission's enforcement program, including supervising investigations and participating in decisions about who should be charged for violations of the Commodity Exchange Act.

**E. NASD Regulation/FINRA**

Beginning in 1997 and for almost 10 years thereafter, I served on the senior management team at NASD Regulation, now called the Financial Industry Regulatory Authority ("FINRA"), in Washington, DC.[1] During my tenure at NASD Regulation, I served in a variety of policy and program roles as described below.

1. My first job at NASD Regulation was Director of Disciplinary Policy ("ODP") in the Office of the President. My responsibilities were an outgrowth of a just-completed SEC investigation of NASD and the NASDAQ Market, which resulted in a Section 21(a) Report[2] pursuant to which NASD undertook to substantially reform and upgrade its regulatory function. Reporting to NASD Regulation President Mary Schapiro and Senior Executive Vice President Elisse Walter, and working closely with leaders in the Enforcement Department, I reviewed all proposed new enforcement matters and settlements to assist in assuring the overall

---

[1] FINRA is a not-for-profit national securities association authorized by the U.S. Congress under the Maloney Act of 1938. FINRA acts as a self-regulatory organization to oversee broker-dealer firms and their representatives under the supervision of the Securities and Exchange Commission ("SEC"). FINRA plays a critical role in ensuring the integrity of America's financial system by, among other things, writing and enforcing rules, examining firms for compliance with those rules, taking disciplinary (*i.e.,* enforcement) action against non-compliers, and educating investors. FINRA's mission is to protect investors and ensure market integrity.

[2] Securities and Exchange Commission, Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and the NASDAQ Market (August 1996).

effectiveness and rigor of the enforcement program. My job was to evaluate the quality of cases being developed for disciplinary enforcement and advise the President.

2.	Beginning in approximately 1998, I switched roles and became Director of Regulation Policy, a new function developed within the reorganized Department of Member Regulation. I reported directly to the Executive Vice President of Member Regulation, who was responsible for leading and executing NASD Regulation's national examination programs. These examinations included regular and special audits of over 3,500 broker-dealer firms to monitor for compliance with prescribed conduct and sales practice rules. As Director of Regulation Policy, my responsibilities, among others, included leading the NASD national Membership Application Program ("MAP"), under which all persons seeking to offer securities brokerage services in the U.S. must endure a rigorous examination to become a member of NASD Regulation and submit to its regulatory authority.

3.	Beginning in 2000, I served as Vice President and Acting General Counsel of NASD Regulation. My responsibility as chief legal officer of the regulatory program was to lead all advisory, rulemaking, interpretive, and adjudicative functions. During this time, I worked closely with SEC staff on policy and program matters affecting banks and broker-dealer firms, including issues arising from the SEC's implementation of the bank exemption provisions of the Financial Services Modernization Act of 1999 (also known as the Gramm-Leach-Bliley Act).

4.      In early 2002, I returned to the Department of Member Regulation as Senior Vice President with broad responsibilities for broker-dealer examinations and for leading NASD's role in administering the securities industry licensing and continuing education ("CE") program.

### F.  Securities Industry Experience

I left NASD Regulation in mid-2006 to join The PNC Financial Services Group ("PNC") as Chief Counsel, Broker-Dealer.  I served as chief legal officer for two broker-dealer/investment adviser affiliates. Reporting to the PNC Bank General Counsel, I was responsible for all legal matters concerning the retail investment business, and for the proactive management of legal, compliance and reputational risk. Among my duties was advising the business on compliance with federal and state securities law and regulation, including Regulation R, a rule issued jointly by the Federal Reserve and the SEC which implements exceptions for banks from the definition of the term "broker" under Section 3(a)(4) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Gramm-Leach-Bliley Act ("GLBA").  Specifically, Regulation R excepts banks from the duty to register with the SEC as a broker for engaging in prescribed securities activities including custody and safekeeping activities.  During my tenure, I advised the bank and its affiliated broker-dealers on compliance with Reg R.

Since retiring from PNC in 2015, I have been engaged part-time in private law practice and as an independent expert witness.  My practice focuses on cases involving federal securities laws and industry compliance practices.

## II.    DATA AND INFORMATION CONSIDERED

A complete list of materials made available to me from which I consulted pertinent records in connection with this report is attached hereto as Appendix A.

III.    **METHODOLOGY**

In forming opinions in this matter, I followed the methodology employed by federal securities regulators, which I learned and applied during my tenure at NASD Regulation, in particular the years I served in the Office of General Counsel and the Department of Member Regulation.  There, I became familiar with the longstanding factors identified and applied by the SEC Division of Market Regulation (now the Division of Trading and Markets) to determine whether a person should register as a broker.  As part of my responsibilities at NASD Regulation, I collaborated with representatives of the SEC's Office of Chief Counsel, Market Regulation in the Agency's development of policy leading to the implementation of the bank exemption provisions of GLBA.  Those provisions are now part of Regulation R, discussed below.  In my role leading policy development in NASD's Membership Application Program I gained insight and perspective about the range of activities comprising securities "brokerage" as that term is understood among regulators and in the industry.

IV.    **COMPENSATION**

My compensation for this matter is $1,000 per hour for all services performed.

V.    **OPINIONS**

A.  **Background**

A central element of the investor protection scheme established by the federal securities laws is the comprehensive framework for the registration and regulation of persons engaged in the business of buying and selling securities.  The Exchange Act is the primary federal legislation governing "brokers" and "dealers" in securities.  Section 3(a)(4)(A) of the Exchange Act defines

a "broker" as "any person[3] engaged in the business of effecting transactions in securities for the account of others."[4] The definition focuses on three elements. A broker must:

    (i)  be "engaged in the business,"

    (ii)  of "effecting transactions in securities,"

    (iii) "for the account of others."

These three terms are not defined in the Exchange Act or the SEC rules thereunder. Thus, courts apply a "facts and circumstances" analysis to evaluate whether a person has acted as a broker, with no single element being dispositive.[5]

> ## B. GEL's Business is Novel and not Typical of What the Securities Industry Would Consider to be "Broker" Activity

The SEC seeks for the first time to assert jurisdiction over a firm providing an innovative and efficient bundle of software and associated back-office services which operate as a bridge between issuers and executing broker-dealers in selling shares of thinly traded securities held by institutional and accredited investors. The SEC alleges that GEL:

> (a) takes possession of its customers' penny stocks; (b) finds executing brokers willing to sell the stocks in the market; (c) directs the executing brokers on completing the sales; and (d) facilitates the settlement of the trades and disbursement of proceeds to its customers.

SEC Complaint, paragraph 3.

Notably absent from the complaint are allegations that GEL is engaged in many of the traditional hallmark activities of "brokerage" business. For one thing, GEL is not involved in

---

[3] The term "person" means "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." See Exchange Act § 3(a)(9).

[4] Exchange Act § 3(a)(4)(A).

[5] *See, e.g.,* SEC, Staff Study on Investment Advisers and Broker-Dealers at 9 (listing examples of brokerage services and products).

purchasing any securities as agent, principal or in any other capacity. Likewise, the SEC does not claim that GEL engages in any marketing or advertising activities[6], or that GEL solicits securities transactions, participates in any negotiations between an issuer and any investor, makes valuations as to the merits of any investment, or gives investors any advice. These types of activities are typical of services securities brokers provide and they are generally accepted within the securities industry as requiring direct regulatory oversight.

Essentially, the SEC claims here that GEL must register because it assists investors in transacting lawful securities business that regulators wish would cease to exist. However, not all acts of participation in the life cycle of a securities transaction trigger a registration requirement. For example, the SEC recognizes that persons who perform largely ministerial or clerical functions with respect to securities transactions need not register as brokers.[7] Examples of activities found to be clerical or ministerial include firms which provide back-office services to broker-dealers.

GEL's business should be looked at in this same way. The Firm offers institutional and accredited investors a platform to connect with executing broker-dealers – all of whom are fully regulated by FINRA and the SEC – and to track the administrative details of their transactions.[8] The account opening documents do not confer any trading authority to GEL. Instead, investors authorize GEL to connect them to executing broker-dealers and to convey the investor's

---

[6] In fact, GEL does not maintain a public website.

[7] In determining whether a person has performed functions beyond those that are clerical and ministerial in nature, the SEC considers the same set of relevant factors used to determine whether a person has engaged in effecting transactions in securities. See, e.g., Universal Pensions, Inc., SEC No-Action Letter (Jan. 30, 1998) (granting no-action relief to a pension plan administrator performing recordkeeping and other administrative services, subject to conditions); Applied Financial Systems, Inc., SEC No-Action Letter (Sept. 25, 1971) (granting no-action relief to entity providing certain shareholder servicing and recordkeeping functions as clerical and ministerial).

[8] The tracking system to which customers have access provides real-time reporting of holdings and next day reporting of all transactions, which enables them to monitor the accuracy of GEL's work. GEL provides clients access to Portfolioshop (a description of which is located at http://portfolioshop.com) at its client-only website https://gelgroupllc.fixq.com.

instructions for execution. GEL requires written price and volume instruction from investors for each and every sale.[9] I saw no evidence that any investor ever was confused or misled. I am not aware that any investor, bank, or broker-dealer complained about GEL's services.

### C. The Custodial Activities at Issue are Properly Supervised under Federal Banking Laws, Not by the SEC

A core premise of the complaint is that GEL is serving as custodian of investor securities which requires SEC oversight. Yet here, all of the custodial activities involving investor securities and sale proceeds are conducted in accounts at banks which are subject to supervision by federal bank regulators. Regulation R, (17 C.F.R. Ch. II Pt. 247) issued jointly by the Federal Reserve and the SEC, implements certain exceptions for banks from the definition of the term "broker" under Section 3(a)(4) of the Exchange Act, as amended in 1999 by GLBA.[10] Among others, Section 760 of Regulation R establishes an exception to the application of the federal securities laws for custody and safekeeping activities when conducted at a bank.[11] The SEC does not have jurisdiction over these accounts.[12] Federal banking regulators have full examination and enforcement authority over the custody accounts maintained for investors in this case. I

---

[9] GEL issues to clients at time of account opening blank Transfer Instruction Forms for clients to instruct on price and volume. GEL's Account Application (an example of which is available at SEC-SABBY-E-0008-20) requires written price and volume instructions prior to communicating such information to executing brokers and GEL does not have authority to deviate from those instructions. An example of a Transfer Instruction Form is available at SEC-DEF-ePRD-000002181.

[10] GLBA eliminated the blanket exception that banks had enjoyed from the definition of "broker" and "dealer" under the Exchange Act. GLBA generally required banks to "push out" most of their securities brokerage and securities dealing activities to registered broker-dealers, except that banks were permitted to continue to perform certain traditional banking activities without registering as broker-dealers with the Commission.

[11] Subject to conditions, banks are exempt from the definition of the term "broker" under Section 760(b) of Regulation R to the extent that, as part of their customary banking activities, the bank accepts orders to effect transactions in securities for an account for which the bank acts as custodian other than an employee benefit plan account or an individual retirement account or similar account.

[12] It took financial regulators eight years to develop what became Reg R in large part because the SEC staff was reluctant to give up jurisdiction over securities activities conducted at banks. See Final Broker Push-Out Rules for Banks – At Long Last, WilmerHale Publication (September 24, 2007).

understand that custodial banks conduct compliance due diligence in connection with opening the accounts.

**D. The Securities Sales at Issue are Already Subject to Regulation by the SEC and FINRA**

The record reflects that the securities sales referenced in the Complaint take place at SEC-registered broker-dealers.  These executing broker-dealers are fully subject to the authority of the SEC and FINRA.  Among other things, broker-dealers have a duty to obtain best execution for all purchases and sales of a customer's securities.[13]  Moreover, as gatekeepers to the public securities markets, broker-dealers are expected by securities regulators to take steps proactively to strengthen their controls to detect and deter potential fraud involving low-priced securities and thereby protect investors from financial harm.[14]  Here, there is evidence that the executing broker-dealers conducted due diligence and oversight of the accounts consistent with regulatory requirements and expectations.[15]

**E. The SEC Overplays the Importance of Transaction-Based Compensation**

As noted, the question of whether a person acts as a securities broker requires a full assessment of all facts and circumstances, with no one factor by itself being sufficient to trigger registration.   Traditionally, the SEC staff has asserted that the receipt of transaction-based

---

[13] FINRA Rule 5310 requires broker-dealers to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."

[14] Specifically, securities regulators expect broker-dealers involved with low-price securities to maintain strong controls in four important areas: detection, monitoring, suspicious activity report filing, and timely reporting of suspected fraud  See FINRA Regulatory Notice 21-03, FINRA Urges Firms to Review Their Policies and Procedures Relating to Red Flags of Potential Securities Fraud Involving Low-Priced Securities.

[15] See Executing Broker's Account Applications, Executing Broker Agreements, and correspondence with executing brokers, which show due diligence efforts on the part of broker-dealers with respect to the clients and transactions. A list of executing brokers was provided at FW-04438 Ex. 44. See also correspondence between Executing Broker and Client, an example of which is located at SEC-Wedbush-E-0005069-73.

compensation in connection with a securities transaction by itself is, as a practical matter, sufficient to require registration. But courts have not been so fast to accept this premise and have concluded that without the presence of other factors transaction-based compensation may <u>not</u> be sufficient to be considered engaging in the business of effecting transactions in securities.[16]

Here, most of GEL's compensation derives from monthly subscription fees for its administrative services.[17] The subscription fee is fixed and does not depend on or vary in amount with any securities transaction. I understand that only a small proportion of GEL's revenues derive from transaction fees.

## VI.   CONCLUSION

There is no need for the SEC to require registration of GEL to fulfill any market or investor protection purpose. GEL's custodial activities are subject to oversight by banking regulators. GEL's participation in "finding" and "directing" executing broker-dealers and "facilitating" securities trade settlements is largely administrative and already subject to oversight by the SEC and FINRA through the executing broker-dealers.   No investor here has been hurt.   The relief sought in the complaint should be refused.

---

[16] See *SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011).

[17] *See* GEL's Fund Service Fee Schedule (a copy of which is available at GEL_00007615).

Respectfully submitted,

Jeffrey S. Holik

███████████

Dennis, MA 02638

April 7, 2023

## APPENDIX A

## TO THE EXPERT REPORT OF JEFFERY S. HOLIK IN SUPPORT OF

## DEFENDANTS

1. Complaint in *SEC v. GEL Direct Trust, et al.* 1:22-CV-09803

2. Motion to Dismiss, Opposition and Reply in *SEC v. GEL Direct Trust, et al.* 1:22-CV-09803

3. SEC's Rule 26 disclosures in *SEC v. GEL Direct Trust, et al.* 1:22-CV-09803

4. SEC's supplemental and amended disclosures in *SEC v. GEL Direct Trust, et al.* 1:22-CV-09803

5. GEL's Rule 26 disclosures in *SEC v. GEL Direct Trust, et al.* 1:22-CV-09803

6. Regulation R, 17 C.F.R. Ch II § 247

7. The Gramm-Leach-Bliley Act ("GLBA")

8. Section 3(a)(4) of the Exchange Act

9. Final Broker Push-Out Rules for Banks – At Long Last, WilmerHale Publication (September 24, 2007).

10. FINRA Rule 5310

11. See FINRA Regulatory Notice 21-03, FINRA Urges Firms to Review Their Policies and Procedures Relating to Red Flags of Potential Securities Fraud Involving Low-Priced Securities.

12. SEC Investigatory File/Document Production

13. SEC Supplemental Document Production

14. E-mail Correspondences between GEL and GEL's Customers

15. E-mail Correspondences between GEL and the Executing Brokers

16. GEL's Fee Services Agreement

17. GEL's New Client Account Opening Documents

18. GEL's Transfer Instruction Form

19. *SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011)

20. US Bank Application

21. Baycrest Application

22. Maxim Application

23. BTIG New Account Package

24. PNC Bank Corporate Business Account Statements

25. BBVA Custody Agreement

26. List of Executing Brokers

27. Bryn Mawr Trust Account Documents

28. Gel Direct DST Welcome Packet

29. Gel Direct Custody Representation Letter

30. PortfolioShop, Inc. Web Portal

31. PortfolioShop, Inc. Report on Controls

32. Form of Non-Dealer Agreement

33. GEL Certificate of Formation

34. GEL Direct Trust Certificate of Good Standing in Delaware

35. GEL Direct Trust Agreement and Declaration of Trust dated January 25, 2019

36. Bryn Mawr Trust Grantor/Client Information Sheets

37. Bryn Mawr Trust New Customer Identification Program Regulatory Oversight and Client Instruction Form

38. Monnex Third Party Trading Approval Form